# In the United States Court of Federal Claims

**BID PROTEST**

| | | |
|---|---|---|
| CLINICOMP INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-01115-LKG |
| | ) | Judge Lydia Kay Griggsby |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | <u>**REDACTED VERSION**</u> |
| Defendant. | ) | |

<u>**PLAINTIFF CLINICOMP INTERNATIONAL, INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND INCORPORATED BRIEF**</u>

Dated: September 11, 2017

Counsel for Plaintiff CliniComp International, Inc.:

Richard J.R. Raleigh, Jr. (Counsel of Record)
Jerome S. Gabig
Christopher L. Lockwood

WILMER & LEE, P.A.
100 Washington Street, Suite 100
Huntsville, AL 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com
jgabig@wilmerlee.com
clockwood@wilmerlee.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………..iv

QUESTIONS PRESENTED………………………………………………………………....1

STATEMENT OF THE CASE…………………………………………………………………2

ARGUMENT………………………………………………………………………………11

I.    Secretary Shulkin's Attempt to Invoke the Public Interest Exception Fails Close Scrutiny Because the D&F Does Not Clearly and Convincingly Justify Why It Is in the Public Interest to Forego All Competition……………………………………………………13

    A.    Requirements of the Public Interest Exception to CICA………………………...13

    B.    The Attempt to Invoke the Public Interest Exception Is Not Clearly and Convincingly Justified in the D&F or the AR…………………………………...14

    C.    The *Spherix* Case Supports Finding That the D&F Does Not Provide Clear and Convincing Justification for the VA's Sole Source Decision to Cerner…………18

II.    FAR § 6.302-7(b) Denies Secretary Shulkin Authority to Invoke the Public Interest Exception on Grounds Covered by the Specific CICA Exceptions……………………..22

III.    The VA's Lack of Advance Planning Precludes Reliance on the Public Interest Exception………………………………………………………………………………...25

IV.    The D&F Is Actually a Brand-Name Justification Which Cannot Be Used to Deprive a Responsible Offeror an Opportunity to Have Its Product Evaluated Through the Competitive Lens………………………………………………………………………...26

V.    The Decision to Award a Sole Source Contract to Cerner Is Arbitrary and Capricious Because It Failed to Consider Other Important Aspects of the Interoperability Requirement………………………………………………………………………………...33

VI.    The VA's Sole Source Decision Is Arbitrary and Capricious Because It Failed to Consider Cost……………………………………………………………………………34

VII.    The VA's Sole Source Decision Is Arbitrary and Capricious Because It Lacks a Coherent and Reasonable Explanation for Violating FAR § 34.005-1 Which Requires Full and Open Competition Between Alternative Major Systems Sources Until It Is No Longer Economical or Practical to Do So……………………………………………………37

VIII.   The VA Has Failed to Comply With the Statutory Requirements of the Public Interest Exception, Including Written Notification to Congress…………………………………39

IX.    This Court Should Issue Injunctive Relief……………………………………………39

CONCLUSION……………………………………………………………………………..40

## TABLE OF AUTHORITIES

**Cases**

*Aero Corp. v. Dep't of the Navy*,
 540 F. Supp. 180 (D.D.C. 1982) …………………………………………………...12

*Alabama Aircraft Indus., Inc.—Birmingham v. United States*,
 586 F.3d 1372 (Fed. Cir. 2009) ………………………………………………………34

*ATA Def. Indus., Inc. v. United States*,
 38 Fed. Cl. 489 (1997) …………………………………………………………...13

*Bean Stuyvesant, LLC.  v. United States*,
 48 Fed. Cl. 303 (2000) ………………………………………………………………37

*Birch & Davis Int'l, Inc. v. Christopher*,
 4 F.3d 970 (Fed. Cir. 1993) ……………………………………………………...12

*Boeing, Sikorsky Aircraft Support*,
 97–2 C.P.D. ¶ 91, 1997 WL 611539 (1997)……………………………………35

*Bowles v. United States*,
 2015 WL 4710258 (Fed. Cl. July 31, 2015) …………………………………………26

*Crewzers Fire Crew Transport v. United States*,
 111 Fed. Cl. 148 (2013) ……………………………………………….……………35

*Electronic Design, Inc.*,
 B-279662 (Aug. 31, 1998) …………………………………………………………35

*Femme Comp Inc. v. United States*,
 83 Fed. Cl. 704 (2008) …………………………………………………………16

*Framaco Int'l, Inc. v. United States,*
 119 Fed. Cl. 311 (2014) ………………………………………………………13

*Frequency Elecs., Inc.*,
 B-204483 (Apr. 5, 1982) …………………………………………………………...12

*Galen Med. Assocs., Inc. v. United States*,
 369 F.3d 1324 (Fed. Cir. 2004) …………………………………………...16-17

*Glotech, Inc.*,
 B-406761 (Aug. 21, 2012) ……………………………………………….……………35

*Google, Inc. v. United States*,
95 Fed. Cl. 661 (2011)……………………………………………………..21, 30-33, 39

*Graves v. Secretary of the Dept. of Health and Human Services*,
109 Fed. Cl. 579 (2013) ……………………………………………………………23

*Hubbs v. United States*,
20 Cl. Ct. 423 (1990) ………………………………………………………………26

*I.M. Systems Group*,
B-404583 (Feb. 25, 2011) (1997) …………………………………………………35

*Indian & Native Am. Employment & Training Coal*,
B-218973 (Oct. 2, 1985) …………………………………………………………...12

*Keeton Corr., Inc. v. United States*,
59 Fed. Cl. 753 (2004)………….…………………………………………………16

*L-3 Commc'ns EOTech, Inc. v. United States*,
83 Fed. Cl. 643 (2008)…………………………………………………...………12

*Malco Plastics*,
B-219886 (Dec. 23, 1985) …………………………………………………………12

*PGBA, LLC v. United States*,
57 Fed. Cl. 655 (2003) …………………………………………………………….23-24

*RTF/TCI/EAI Joint Venture*,
B-280422 (Dec. 29, 1998) …………………………………………………………..35

*Savantage Financial Services, Inc. v. United States*,
81 Fed. Cl. 300 (2008) …………………………………………………………...31-32, 39

*Serco Inc. v. United States*,
81 Fed. Cl. 463 (2008) …………………………………………………………35-36

*Sheridan Corp. v. United States*,
95 Fed. Cl. 141 (2010) …………………………………………………………...16

*Spherix, Inc. v. United States* ("*Spherix I*"),
58 Fed. Cl. 351, 358 (2003)………………………………………….......11-12, 17-22

*Spherix, Inc. v. United States* ("*Spherix II*"),
58 Fed. CL 514 (2003)…………………………………………………………...12, 18-22

*S. Techs., Inc.*,
    66 Comp. Gen. 208 (Jan. 9, 1987) ……………………………………………………12

*T & M Distributors, Inc. v. United States*,
    1998 WL 118077 (Fed. Cl. Mar. 17, 1998) …………………………………………..13

*ViON Corporation v. United States*,
    122 Fed. Cl. 559 (2015) ……………………………………………………………39

*Wheeler v. United States*,
    3 Cl. Ct. 686 (1983) …………………………………………………………………27

## Statutes and Regulations

31 U.S.C. § 3553………………………………………………………………………………23

41 U.S.C. § 3301 …………………………………………………………………...……………13

41 U.S.C. § 3304 …………………………………………………………………...……Passim

FAR § 1.102-2………………………………………………………………………………36

FAR § 1.704……………………………………………………………………...14, 16-17

FAR § 2.10 …………………………………………………………………………………37

FAR § 6.301………………………………………………………………………………25

FAR § 6.302–7 …………………………………………………………………12-14, 22-25

FAR § 11.105 …………………………………………………………………………………27

FAR § 15.304 …………………………………………………………………………………36

FAR 33.103 …...………………………………………………………………………………38

FAR § 34.005-1 …………………………………………………...……………37-38

## Other

OMB Circular A-130…………………………………………………………………………36

## QUESTIONS PRESENTED

1.      Whether the Determination and Findings ("D&F") signed by VA Secretary Shulkin provides "clear and convincing justification" that it is "necessary in the public interest" for the VA to forego all competition regarding acquisition of its next generation electronic EHR system in favor of a sole source award to Cerner Corporation?

2.      Whether FAR § 6.302-7(b) denies Secretary Shulkin authority to use the public interest exception where Congress has enacted other specific exceptions to address the stated grounds for his decision?

3.      Whether the VA's lack of advance planning precludes it from invoking the public interest exception to CICA?

4.      Is this procurement merely a brand-name justification, which cannot be used to deprive a responsible offeror an opportunity to have its product evaluated through a competitive lens?

5.      Is the decision to award a sole source contract to Cerner arbitrary and capricious for failure to consider important aspects of the asserted interoperability requirement?

6.      Is the VA's sole source decision arbitrary and capricious because the VA failed to consider cost?

7.      Is the VA's sole source decision arbitrary and capricious because it violates requirements of full and open competition between alternative major systems sources until it is no longer economical or practical to do so?

8.      Has the VA complied with the statutory requirements of the public interest exception, including written notification to Congress no less than 30 days prior to award?

## STATEMENT OF THE CASE

The VA's current electronic health record ("EHR") system, the Veterans Health Information Systems and Technology Architecture ("VistA"), is a suite of many applications and distributed systems.  (AR Tab 1 at 1).  There is no dispute that VistA is in need of major modernization to keep pace with improvements in health information technology and cybersecurity.  (*Id.*)

In 2014, the GAO issued a report on the coordination of EHR efforts between the VA and DoD.  (AR Tab 5).  Prior to 2014, VA and DoD adopted an initiative to develop a "single, integrated [EHR] system for both departments."  (AR Tab 5 at 35).  Two years later, however, the agencies changed course and instead they decided to pursue separate systems tailored to their own individual needs.  (*Id.*)  As explained in the GAO Report:

> About 2 years after taking actions toward the development of iEHR, VA and DOD announced changes to their plan—essentially abandoning their effort to develop a single, integrated electronic health record system for both departments. In place of this initiative, the departments stated that VA would modernize its existing VistA health information system, DOD would buy a commercially available system to replace its existing AHLTA system, and the departments would ensure interoperability between the two new systems.

(AR Tab 5 at 35).

As noted in the 2014 GAO Report, the decision to change course and pursue separate EHR systems was purportedly based on a determination by the VA and DoD that pursuing a single common system would take too long and be too expensive.  (AR Tab 5 at 37).  However, the GAO found a lack of interagency planning on those issues.  The GAO found that neither the VA nor the DoD had demonstrated the credibility of their assumptions regarding time and cost:

> Although VA and DOD based their decision to no longer pursue a single system on the assertion that their new approach to pursue separate systems would be less

expensive and faster, <u>the departments have not demonstrated the credibility of this assertion</u>.

(AR Tab 5 at 37) (emphasis added).

> VA and DOD lost valuable time toward providing service members, veterans, and their health care providers with a long-awaited interoperable electronic health record by agreeing to initiate joint development of a single system in March 2011, and then deciding in February 2013 that the endeavor was too expensive and that the planned system would take too long to develop.

(AR Tab 5 at 51-52).

Looking forward, the GAO Report noted that, regardless of whether the agencies decided to pursue a single common system or separate systems, they would continue to face a number of non-technical barriers to coordination of their respective EHR efforts:

> Further, even though VA and DOD have determined that their electronic health record system needs overlap, the departments have <u>neither removed long-standing barriers to working together to address their common needs nor positioned the Interagency Program Office for effective collaboration going forward</u>.

(*Id.*) (emphasis added).

Accordingly, the GAO made a number of specific recommendations.  (AR Tab 5 at 52-53).  Among other things, the GAO specifically recommended that the VA and DoD develop a cost and schedule estimate for their single-versus-separate EHR approaches, as well as a plan describing how the agencies will coordinate their interoperability efforts.  (AR Tab 5 at 52-53).

The Administrative Record ("AR") is devoid of any evidence that the VA heeded the planning recommendations of the 2014 GAO Report before issuing the D&F.  The AR contains no cost and schedule estimate by the VA and DoD comparing single-versus-separate approaches, nor does it contain the recommended plan between the VA and DoD to address the interoperability barriers identified by the GAO.

As it turns outs, history has a tendency to repeat itself.  After abandoning its initial effort to pursue a single common EHR system with DoD, the VA recently began questioning its strategy of VistA modernization.  (AR Tab 7 at 236).  Despite previously finding that a single common system would be too expensive and take too long, the VA now seeks to reverse course (again) and return to the single system plan.  (AR Tab 1 at 1-4).  In doing so, despite the absence of any studies or planning with the DoD in the AR, the VA now says that separate systems would take too long, and that interoperability with the DoD is more important than cost.   (AR Tab 1 at 1-4; Tab 44 at 2166-67).

According to the D&F, "The VA has been facing a difficult decision whether to continue to modernize VistA or to select a commercial EHR."  (AR Tab 1 at 3).  A May 1, 2017 study commissioned by the VA entitled "Report on the Strategic Options for the Modernization of the Department of Veterans Affairs Electronic Health Records" (the "Grant Thornton Report") observes:

> At its inception, VistA was a revolutionary concept in healthcare management and served as an industry catalyst in the development of commercial EHR vendors such as Cerner and Epic.
>
> ***
>
> Several factors, however, have led VA to question whether continuing with VistA is the best path forward.  This is especially true now that more agile and technologically advanced EHR platforms are readily available in the commercial sector that can serve as the launching pad for delivering functionalities (*e.g.*, clinicians reviewing and editing Veteran records and images remotely, Veterans scheduling appointments using mobile devices) that have already become common in the commercial market while adopting new innovations (*e.g.*, provide virtual health including video communication and vitals assessment).

(AR Tab 7 at 236).

The Grant Thornton Report also observed, "In many ways, industry innovation in EHR technology has leapfrogged VA." (AR Tab 7 at 237). The report explains its purpose as follows:

> Secretary Shulkin announced in January 2017 that he would make a decision regarding the future of VA's EHR platform in July 2017. VA directed Grant Thornton to conduct an independent assessment of four strategic options for modernizing its EHR, with a focus on technological aspects of the implementation.

(AR Tab 7 at 238). The four strategic options identified in the report are: (1) Commercial off-the-shelf ("COTS") EHR; (2) COTS EHR combined with the Joint Legacy Viewer ("JLV") and electronic Health Management Platform ("eHMP"); (3) VistA commercialization; and (4) COTS EHR provided as Software as a Service ("SaaS"). (*Id.*). In other words, three of the options involved acquiring some form of commercial off-the-shelf product, while the fourth option involved continuation with VistA.

As shown below, the Grant Thornton Report found that complete interoperability with DoD and community providers was achievable for <u>every one</u> of the four options:

Figure 2. Option Alignment with Clinical Priorities

| Clinical Priorities | Option 1: COTS | Option 2: COTS + eHMP | Option 3: Commercialized VistA | Option 4: COTS SaaS |
|---|---|---|---|---|
| Addresses features unique to VA | ⬤ | ⬤ | ⬤ | ⬤ |
| Workflow | ⬤ | ⬤ | ⬤ | ⬤ |
| Team-based care | ⬤ | ⬤ | ⬤ | ⬤ |
| Analytics and research | ⬤ | ⬤ | ⬤ | ⬤ |
| Mental health | ⬤ | ⬤ | ⬤ | ⬤ |
| Interoperability with DoD and community providers | ⬤ | ⬤ | ⬤ | ⬤ |

⬤ Complete   ⬤ Partial   ⬤ Limited   ⬤ Not Aligned

(AR Tab 7 at 246).

The Grant Thornton Report also inquired into the availability of vendors who could perform the work identified in each of the four options.  After surveilling the market, the Report concluded that competition among vendors to provide an EHR that met the VA's requirements (including interoperability with the DoD) was readily obtainable.  In particular, for the three options involving commercial off-the-shelf products (that is, every option, except VistA), the Report ascertained "<u>low</u>" risk due to the existence of qualified vendors.  (AR Tab 7 at 249, Figure 6, last row of table) (emphasis added).

The Grant Thornton Report also advised that interoperability with systems used by community providers (*e.g.*, TRICARE) is just as critical as interoperability with DoD, and, therefore, interoperability with the DoD alone should not drive the VA's decision regarding its next generation EHR platform.  (AR Tab 7 at 242).  The Report stated:

> *Interoperability and care in the community and interoperability:* In assessing interoperability, there is great focus on the interoperability between DoD and VA. However, in interviews and in assessing the care continuum for military members as they serve and transition to Veteran status, the interoperability with DoD is critical at the transition stage, but no more important thereafter than interoperability with community care providers.  <u>Therefore, interoperability with DoD alone should not drive the decision regarding the option, or the eventual vendor solution.</u>

(*Id.*) (emphasis added).   The DoD agrees, stating that there are "<u>two equally important</u> objectives:  improving data interoperability with both the VA and our private sector healthcare partners, and successful transitioning to a state-of-the-market electronic health record that is interoperable with VA and the commercial healthcare systems used by [DoD] TRICARE providers."  (AR Tab 29 at 712).

The AR also reflects that "most [VA Medical Centers] have customized their local versions of VistA, leading to approximately 130 different versions of VistA across the country." (AR Tab 30 at 817).  As a result, focusing exclusively on interoperability with DoD is a vast oversimplification of the problem: "VHA's EHR issues stymie interoperability among VHA facilities as well as between VHA and DoD and other non-VHA providers."  (AR Tab 30 at 819).

Further explanation of VA's technical history challenges can be found in a Sources Sought for EHR systems issued by the VA on April 11, 2017:

> Technical history:  For decades, VA has been using a custom EHR called VistA with a Delphi-based front-end called Computerized Patient Record System (CPRS).  The technical foundations of VistA are solid, and CPRS has won many accolades.  VA has 130 instances of this EHR, each of which is somewhat but significantly different. The differences in data and business logic result in significant heterogeneity of clinical practices and make it difficult to standardize them.  VistA improvements include standardization of code and providing APIs. However, data and business logic has not been standardized across the VistAs.

(AR Tab 35 at 1210).

The VA's Sources Sought instructed that responses "should include how the vendor would interface a commercialized version of eHMP or a commercial alternative with VistA and/or commercial EHRs."  (AR Tab 35 at 1197).  In response to the VA's Sources Sought notice, the following twenty-five (25) vendors submitted expressions of interest:  Accenture; Cognitive; McKinsey; Allscripts; Composite Apps; McKinsey; APEX Data Solutions; Orion Health; Appian; Coriendo; OSEHRA; B3 Group Inc.; IBM; PWC – PriceWaterhouseCoopers; Book Zurman Inc.; Infinite; CSRA; Cerner; Infor; the Arcanum Group; Cisco; InterSystems; Talis; Thrasys, Inc.; Syntranet; and TSRI.  (AR Tab 38 at 1248-1785).

On June 1, 2017, notwithstanding the immense market interest received by the VA in response to the Source Sought, VA Secretary David Shulkin signed a Determination and Findings ("D&F") stating that the VA had decided to award a sole source contract to Cerner for the VA's next generation EHR system.  (AR Tab 1 at 1-4).  The D&F observed that the DoD was acquiring an EHR system, now known as MHS GENESIS, which "at its core consists of Cerner Millenium, a commercial EHR developed by Cerner[.]"  (AR Tab 1 at 2).

The VA's ultimate decision is unclear, as its statements about its intent conflict.  In some of the documents in the AR, the VA suggests it is going to a "single common system," and portions of the D&F seem to indicate is the VA is planning on keeping all medical records (for active duty military personnel and veterans) together on the same system.  (*See, e.g.,* AR Tabs 1, 21 and 43.).  But, the VA has also stated:  "[the]  VA has unique needs and many of those are different from the DoD.  For this reason, VA will not simply be adopting the identical EHR that DoD uses, but we intend to be on a similar Cerner platform."  (AR Tab 44 at 2167). While the VA suggests that, "VA's adoption of the same EHR system as DoD will ultimately result in all patient data residing in one common system" (AR Tab 44 at 2166), and the D&F says, "A single common system across VA and DoD will facilitate the transition of active duty military members to VA and improve their timely access to the highest quality of care in a way never before experienced," and "[r]ecords residing in a single common system will eliminate the reliance on complex clinical interfaces or manual data entry between DoD and VA" (AR Tab 1 at 2, ¶ 7), the VA also says that the "VA will not simply be adopting the identical EHR that DoD uses, but [it] intend[s] to be on a similar Cerner platform."  (AR Tab 44 at 2167).

Regarding DoD's acquisition of Cerner's EHR system, the D&F stated:  "The entire acquisition process, starting from requirements generation until contract award, took

approximately 26 months." (AR Tab 1 at 2, ¶ 5). Without citing any plans, studies, or reports, Secretary Shulkin asserts: "Continuing to modernize VistA or selection a different commercial EHR other than the DoD EHR system, with a single shared record, will result in VA having to develop and maintain an increasingly complex technical architecture without providing seamless care." (*Id.* at 3, ¶ 9). Based upon that assertion, and again, without citing any plans, studies, or reports, the Secretary determined that it was "in the public interest" for the VA to issue a sole solicitation directly to Cerner for the acquisition of the EHR system being deployed by the DoD. (AR Tab 1 at 5).

There is nothing in the D&F that says what plans, studies, or reports the Secretary considered in determining that it is in the public interest for the VA to forego all competition and instead limit itself to a sole source procurement from Cerner. (AR Tab 1 at 1-5). Despite the specific recommendations in the 2014 GAO Report, the D&F cites no study of cost and schedule, nor does it cite any plan between the VA and DoD to remove the "long-standing barriers" to coordination of their EHR systems. (*Id.*) Not only is the D&F itself silent on these issues, there is also nothing in the AR that says what, if anything, the Secretary considered in issuing the D&F.

Much of the information in the AR is dated <u>after</u> the D&F, including the Certificate of Administrative Record signed by a contracting officer on August 30, 2017. (AR CO Certification). That Certificate does <u>not</u> state that Secretary Shulkin reviewed any of the documents in the AR, nor does it say that the contracting officer has firsthand knowledge of anything the Secretary did or considered.[1] (*Id.*) Instead, the contracting officer merely states "to

---

[1] One contracting officer signed the AR certificate, but the AR indicates, in the Acquisition Plan, that someone else is actually the contracting officer. (AR Tab 43 at 2132).

the best of [his] knowledge and belief" that the documents "were considered" by someone, at some point (he does not say who or when).  (*Id.*)

Following the Secretary's signing of the D&F on June 1, 2017, his decision was publically announced in a June 5, 2017 News Release by the VA.  (AR Tab 44 at 2166-67). The following extracts from the VA News Release provide further insight into the basis for Secretary Shulkin's decision:

- "Congress has been urging the VA and DoD <u>for at least 17 years</u> — from all the way back in 2000 — to work more closely on EHR issues."

- "<u>Because of the urgency and the critical nature of this decision, I have decided that there is a public interest exception to the requirement for full and open competition in this technology acquisition.</u>"

- "When DoD went through this acquisition process in 2014 it took far too long. The entire EHR acquisition process, starting from requirements generation until contract award, took approximately 26 months.  <u>We simply can't afford to wait that long when it comes to the health of our Veterans.</u>"

- "Because of the <u>urgency</u> and the critical nature of this decision, I have decided that there is a public interest exception to the requirement for full and open competition in this technology acquisition."

- "I have decided that <u>we can't wait years</u>, as DoD did in its EHR acquisition process, to get our next generation EHR in place."

(AR Tab 40 at 2166-67) (emphasis added).

On June 14, 2017, CliniComp filed an agency-level protest of the VA's sole source decision.  (AR Tab 44).  Accompanying the agency-level protest was a declaration CliniComp's CEO, which included the following information about CliniComp and its capability to meet the requirements of the VA:

- CliniComp is a global provider of hardware, software, and support for clinical documentation systems today known as Electronic Health Records ('EHR')  systems. CliniComp has enjoyed an unrivaled, industry-leading

track record of performance and reliability in the most complex, high-acuity hospital environments for decades.

- CliniComp has proudly served military personnel in the Department of Defense ('DoD') hospitals for 30 years and veterans in the Department of Veterans Affairs ('VA') for 25 years. CliniComp customers include 60 DoD medical treatment facilities and clinics, 42 VA medical centers, and commercial hospitals spread over seven countries and three continents.

- <u>CliniComp's currently available web-based EHR system has the technical capability to achieve immediate interoperability between the DoD and VA.</u> This activation would give access to the 1.5+ million online patient years of data that are currently on the system of record, CliniComp VA and DoD systems. CliniComp has made frequent requests to demonstrate this capability but has never been provided the opportunity. I am repeating this offer in my declaration.

- CliniComp's EHR architecture is more robust than other alternatives and therefore can achieve the requisite interoperability much easier and faster than those alternatives.

(AR Tab 44 at 2189-90) (emphasis added).

## <u>ARGUMENT</u>

This Court must review Secretary Shulkin's decision to invoke the public interest exception to the Competition in Contracting Act ("CICA") with "close scrutiny" to determine whether it is "clearly and convincingly justified."  In *Spherix, Inc. v. United States* ("*Spherix I*"), 58 Fed. Cl. 351, 358 (2003), the Court of Federal Claims stated:  "By establishing procedures that require the Secretary to adopt a written finding setting out facts and circumstances that <u>clearly and convincingly justify</u> her determination of the public interest, § 6.302–7 does provide <u>a meaningful standard of review</u>."  (Emphasis added.)

First, while this Court affords rational basis review to certain types of agency decisions, this Court has also held that an agency's decision to exclude all competition in favor of a single source is subject to a heightened level of "close scrutiny" under CICA.  *See L-3 Commc'ns*

*EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650–51 (2008) ("Where, as here, the government has established a competitive range of one, the court must closely examine the reasons for eliminating all other competitors from the procurement."). *See also Frequency Elecs., Inc.*, B-204483 (Apr. 5, 1982); *Indian & Native Am. Employment & Training Coal*, B-218973 (Oct. 2, 1985); *Malco Plastics*, B-219886 (Dec. 23, 1985); *S. Techs., Inc.*, 66 Comp. Gen. 208, 210 (Jan. 9, 1987); *Aero Corp. v. Dep't of the Navy*, 540 F. Supp. 180, 201 (D.D.C. 1982); *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 974 (Fed. Cir. 1993). Here, because the Secretary's decision excludes all competition in favor of a single source, Cerner, the decision should be reviewed with "close scrutiny" by the Court.

Second, in addition to warranting "close scrutiny," a decision to invoke the "public interest" exception to CICA must be "clearly and convincingly justified." FAR § 1.704 states: "Each D&F shall set forth enough facts and circumstances to <u>clearly and convincingly justify</u> the specific determination made." (Emphasis added). *See also Spherix, I,* 58 Fed. Cl. 351 (2003) (holding that a public interest D&F was subject to judicial review by the Court of Federal Claims); and *Spherix, Inc. v. United States* ("*Spherix II*"), 58 Fed. Cl. 514 (2003) (reviewing a public interest D&F to determine where it was "clearly and convincingly justified.") As a result, this Court has recognized that "[FAR] § 6.302–7(c) <u>does not protect the Secretary's discretion but limits it</u> to the extent that her [or his] determination must be made only upon a clearly convincing justification." *Spherix I*, 58 Fed. Cl. at 357 (emphasis added).

Taken together, the foregoing demonstrates that this Court must review the Secretary's decision to exclude all competition in favor of a sole source award to Cerner with "close scrutiny" to determine whether that decision is "clearly and convincingly justified." As explained below, not only does the Secretary's decision fail to survive close scrutiny for clear

and convincing justification, it fails to survive even rational basis review and is arbitrary and capricious based upon the AR before the Court.

**I.     Secretary Shulkin's Attempt to Invoke the Public Interest Exception Fails Close Scrutiny Because the D&F Does Not Clearly and Convincingly Justify Why It is Necessary in the Public Interest to Forego All Competition.**

**A.     Requirements of the Public Interest Exception to CICA.**

"The United States Congress and the Office of Federal Procurement Policy have stated a clear policy preference for maximum competition through the Competition in Contracting Act ('CICA') and the Federal Acquisition Regulation ('FAR')." *Framaco Int'l, Inc. v. United States,* 119 Fed. Cl. 311, 317 (2014).  "CICA embodies a strong commitment to achieving the benefits of competition in government procurement[.]" *ATA Def. Indus., Inc. v. United States*, 38 Fed. Cl. 489 (1997); *T & M Distributors, Inc. v. United States*, No. 97-148C, 1998 WL 118077, at *5 (Fed. Cl. Mar. 17, 1998), aff'd, 185 F.3d 1279 (Fed. Cir. 1999).  In furtherance of this strong policy favoring competition, CICA generally requires the Government to utilize "full and open competition" to the maximum extent practicable in all of its procurements, unless a specific statutory exception applies.  41 U.S.C. § 3301.

In the D&F, Secretary Shulkin seeks to use CICA Exception #7, "public interest." *See* 41 U.S.C § 3304(a)(7); FAR § 6.302-7.  The statutory requirements for the public interest exception are as follows:

> (7) the head of the executive agency (who may not delegate the authority under this paragraph) –
>
> (A) determines that it is necessary in the public interest to use procedures other than competitive procedures in the particular procurement concerned; and
>
> (B) notifies Congress in writing of that determination not less than 30 days before the award of the contract

41 U.S.C. § 3304(a)(7). *See also* FAR § 6.302-7.

FAR § 6.302-7 provides additional limitations on the Secretary's ability to invoke the public interest exception. *See Spherix* I, 58 Fed. Cl. at 357. As one such limitation, FAR § 6.302-7(c) requires a written Determination and Finding ("D&F") to invoke the exception. Regarding the content of the D&F, FAR § 1.704 states: "Each D&F <u>shall</u> set forth the enough facts and circumstances to <u>clearly and convincingly justify</u> the specific determination made." (Emphasis added). To establish clear and convincing justification, the D&F must contain, among other information: "Findings that detail the particular circumstances, facts, or reasoning essential to support the determination. Necessary supporting documentation shall be obtained from appropriate requirements and technical personnel." FAR § 1.704(d).

### B. The Attempt to Invoke the Public Interest Exception Is Not Clearly and Convincingly Justified in the D&F or the AR.

The VA essentially concedes that CICA Exceptions #1-6 do not apply. (AR Tab 46). On its face, the D&F relies solely on the public interest exception and its accompanying regulations. In response to CliniComp's agency-level protest, the VA admitted that "the Secretary did not use the unusual and compelling urgency exception, but rather the public interest exception, pursuant to FAR 6.302.7." (AR Tab 46 at 2198). Fatally, however, the D&F fails to clearly and convincingly demonstrate why "it is necessary in the public interest" for the VA to forego all competition from other potential offerors such as CliniComp. Indeed, the D&F wholly fails to answer the crucial question: "Why is it contrary to the public interest for the VA to obtain competition in this procurement?" Having failed to answer that crucial question, the Secretary's reliance on the public interest exception cannot be sustained.

In the D&F, Secretary Shulkin reasons that DoD is in the process of adopting a Cerner-based EHR system, and he notes various benefits that would be anticipated to flow from the VA's adoption of the same system as DoD.  (AR Tab 1 at 1-4).  However, the mere recitation of the perceived benefits of Cerner is insufficient to invoke the public interest exception.  Although the D&F discusses the potential interoperability benefits of buying from Cerner, it completely fails to explain why the VA could not accomplish its goal of interoperability through full and open competition, nor does it explain why full and open competition is not in the public interest.  Presumably, if this procurement had been conducted with full and open competition, each offeror would have submitted a proposal to the VA extolling the competitive benefits of their respective systems in comparison to alternatives such as Cerner.  Presumably, the number of vendors who would have submitted proposals would have been significant in light of the VA's Sources Sought which generated responses from 25 companies.  (AR Tab 35 at 1197; Tab 38 at 1248-1785).  The VA could have defined its needs in a solicitation, and offerors would have submitted proposals to meet those needs.[2]

The D&F is replete with arbitrary assertions that do not survive close scrutiny and do amount to clear and convincing justification.  First, there is nothing in the D&F which indicates what, if anything, Secretary Shulkin relied upon in arriving at his determination.  (AR Tab 1 at 1-4).  Although FAR § 1.704(d) requires the D&F to include "necessary supporting documentation," the Secretary does not mention any specific studies, statistics, plans, or reports supporting his decision that Cerner is "best positioned" to meet the VA's needs.  In fact, there is

---

[2] The VA does not claim that there is an "unusual and compelling urgency" nor otherwise invoke 41 U.S.C. § 3304(a)(2).  In fact, the VA denies that it used the "unusual or compelling urgency" exception.  (AR Tab 46 at 2198).  Furthermore, the 2014 GAO report suggests that the VA had plenty of time to engage in full and open competition.  (AR Tab 5.)

no indication that the Secretary actually reviewed or relied upon any of the documents offered by the VA in the AR.  For example, AR Tab 11 is "Testimony of Debra A. Draper, GAO, before the Senate Committee on Veterans' Affairs, dated April 29, 2015."  Yet, there is no indication in the D&F or otherwise that the Secretary relied upon anything in Ms. Draper's testimony.  Similarly, AR Tab 23 is "VA Office of Inspector General (OIG) Report: "Review of Defects in VA's Computerized Patient Record System Version 27 and Associated Quality of Care Issues, dated June 29, 2009," but the report is not addressed to Secretary Shulkin, and nothing in the D&F or AR indicates he reviewed the report.  Likewise, AR Tab 21 is a "MFR regarding Definition and Usage of Single Common System, dated May 31, 2017," but the MFR is not addressed to Secretary Shulkin.  The D&F does not state that the Secretary reviewed this MFR, or any MFRs or reports in the AR.

Not only is the D&F silent on these issues, the AR lacks support for the assertions made in the D&F.  "The court must be guided solely by the contents of the administrative record and reject conjecture."  *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 770 (2008).[3]  In the index to the AR, Defendant's counsel mentions (in a footnote) documents provided in a binder to Secretary Shulkin.  "Statements of counsel, however, are not evidence." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1339 (Fed. Cir. 2004).  The footnote of Defendant's counsel is not evidence that the Secretary was provided a binder, that he reviewed the documents in the binder, or that any documents in the record served as the basis for his Determination and

---

[3] *See also Keeton Corr., Inc. v. United States*, 59 Fed. Cl. 753, 759 (2004)("BOP's assertions regarding the use of purchase orders are unsupported by the administrative record and contrary to law. Therefore, the BOP's determination and findings cannot withstand scrutiny under the rational basis standard of review."); *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 154 (2010)("Therefore, the Court concludes that the proposed corrective action of resoliciting proposals lacks a rational basis and is not supported by the administrative record.").

Findings.  There is no certification of what was considered by the Secretary; instead, Defendant provided a certification from a contracting officer who merely states "to the best of [his] knowledge and belief" that the documents were "considered" by someone at some point (he does not say who or when).  (CO Certification of the AR).

Neither Secretary Shulkin, nor the contracting officer in his certification, has provided any evidence that the Secretary considered anything in the AR before signing the D&F on June 1, 2017.[4]  Without support for the contentions in the D&F, the VA cannot credibly argue that the D&F sets "forth enough facts and circumstances to clearly and convincingly justify the specific determination made."  *See Spherix I*, 58 Fed. Cl. at 357 citing FAR § 1.704.  Nor does the D&F include "findings that detail the particular circumstances, facts, or reasoning essential to support the determination."  *Id*.

Furthermore, evidence in the AR shows that CliniComp could provide the VA with interoperable EHR solutions that may be less expensive, better performing, and more quickly implemented than what the VA would obtain through the anticipated sole-source contract to Cerner.  (AR Tab 44 at 2189-90).  Numerous other companies also responded to the VA's Sources Sought notice.  (AR Tab 38 at 1248-1785).  The VA has effectively deprived itself of the ability to review, through competition, the alternative benefits of cost, performance, and time, by deciding, at the outset, that it will not consider anyone other than Cerner, regardless of how much Cerner's solution might cost, how well it works, or how quickly it can be implemented. The VA's decision to award to Cerner without consideration of any factors, other than the fact

---

[4]  Many of the documents in the AR post-date the signing of the D&F, and, therefore, the Secretary could not have reviewed and relied upon them in support of his statements in the D&F.

17

that the DoD has decided to adopt a Cerner-based system, is not clearly and convincingly justified but is instead arbitrary and capricious.

C.      The *Spherix* Case Supports Finding That the D&F Does Not Provide Clear and Convincing Justification for the VA's Sole-Source Decision to Cerner.

The public interest exception is rarely invoked, and even more rarely the subject of judicial review. Few cases exist in which this Court has reviewed the requirements of the exception. One of the rare instances is the *Spherix* case, 58 Fed. Cl. 351 (2003) and 58 Fed. Cl. 514 (2003). In that protest, several agencies collaborated to create a single electronic reservation system for their federal recreational facilities, which had historically utilized separate systems, serviced by separate vendors, under separate contracts. The largest of the separate reservation systems was the National Recreation Reservation System ("NRRS"), operated by ReserveAmerica, for more than 1,900 sites under various agencies covered by an interagency agreement. The protestor, Spherix, had a separate contract to operate the reservation system for 35 sites under the National Parks Service ("NPS").

The Office of Budget and Management recommended consolidation of the separate reservation systems under the NRRS. To begin the consolidation, the Secretary of Agriculture issued a public interest D&F to add 17 NPS sites (not under Spherix's existing contract) to the NRRS by way of a contract modification with ReserveAmerica, without a competitive procurement. However, the D&F specifically stated that a new contract for the consolidated NRSS system would be solicited using full and open competition. *Spherix II*, 58 Fed. Cl. at 516. In summary, the agencies' plan was to add a number of sites to the existing NRSS contract and then, after the consolidation, solicit proposals for the consolidated system using full and open competition.

18

In *Spherix I*, 58 Fed. Cl. 351 (2003), the Court addressed a motion to dismiss in which the government argued that the Court of Federal Claims lacked jurisdiction to review the Secretary's decision to invoke the public interest exception.  The Court rejected that argument and held that "it has jurisdiction to decide whether the Secretary of Agriculture's determination that it is necessary in the public interest to make a sole source modification to intervenor's contract is clearly and convincingly justified, as required by 48 C.F.R. § 6.302–7 …." *Id.* at 358.

In *Spherix II*, 58 Fed. CL. 514 (2003), the Court proceeded to consider whether the D&F provided clear and convincing justification of public interest.  Although the Court in *Spherix II* ultimately upheld the Secretary's action, the decision is distinguishable on several grounds which demonstrate that the VA Secretary's action in this case is due to fail.

First, the decision in *Spherix* involved an interagency agreement between Department of Agriculture, Department of Interior, and Army Corps of Engineers to create a single consolidated reservation system under the NRRS.  Here, while the D&F expresses that it is a goal of the VA to create a "single common system" with the DoD, there is no evidence in either the D&F or the AR of an interagency agreement by which DoD has agreed to implement a "single common system" with the VA.

Policy disagreement, not technology, has been the real barrier to coordination of EHR systems between the VA and DoD.  In fact, the 2014 GAO Report indicates that coordination of EHR systems has been a longstanding subject of disagreement between VA and DoD for years, and that the agencies continue to face longstanding policy barriers on that issue.  (AR Tab 5.) Thus, the GAO recommended that VA and DoD come up with a specific plan to resolve those issues; yet, there is no such plan mentioned in the D&F or provided in the AR.  While the VA may now wish to create a "single common system" with the DoD, it is impossible to do so until

both agencies, by mutual planning and agreement, have determined how they will integrate their systems with each other.

Here, because there is no evidence in the AR of an interagency agreement between VA and DoD to share a "single common system" (and no agreement is stated in the D&F), Secretary Shulkin's unilateral pronouncement that purchasing from Cerner will produce a "single common system" rings hollow.  Furthermore, the VA is unclear about whether it is actually creating a "single common system" with the DoD, as opposed to just buying the same brand of product that another agency purchased.  The VA's News Release clarifies: "[the] VA has unique needs and many of those are different from the DoD.  For this reason, VA will not simply be adopting the identical EHR that DoD uses, but we intend to be on a similar Cerner platform."  (AR Tab 44 at 2167).  The VA suggests that, "VA's adoption of the same EHR system as DoD will ultimately result in all patient data residing in one common system" (AR Tab 44 at 2166), and "[r]ecords residing in a single common system will eliminate the reliance on complex clinical interfaces or manual data entry between DoD and VA."  (AR Tab 1 at 2).  But, since the "VA will not simply be adopting the identical EHR that DoD uses," but merely "intend[s] to be on a similar Cerner platform" (AR Tab 44 at 2167), what is proposed is not really a "single common system," it is simply using the same commercial product.

A single shared record across the VA and DoD requires, as a threshold issue, a single shared governance; an issue that can only be resolved through interagency agreement.  At the very best, absent an interagency agreement, the VA will achieve only a system that is similar, but nonetheless separate, from DoD.  The reality, as reflected in the 2014 GAO Report and alluded to in the VA News Release mentioning "different" and "unique" needs, is that the VA and DoD have radically different views about governance issues, which has presented a longstanding

barrier to coordination. Without an interagency agreement to resolve those governance issues, the two systems may achieve some degree of interoperability, but the AR demonstrates that any number of potential offers, including CliniComp, also have the technology to provide the same interoperability.

Second, the D&F in *Spherix* effectively involved an interim measure, not unlike a bridge contract, in order to better and more effectively compete the forthcoming contract for the consolidated reservation system. Importantly, the Court in *Spherix* stated:

> Although the government has predetermined the NRRS as the system from which it intends to build a one-stop, single reservation system, that is not the same as a predetermination of the winner of the competition for a consolidated system. Any number of companies could presumably modify, operated, and maintain the NRRS in accordance with the terms of the anticipated 2004 solicitation.

*Spherix II,* 58 Fed. Cl. at 517.

Thus, in *Spherix*, the agency complied with FAR § 6.303-2(a)(11)'s requirement to state, in the D&F, the "actions, if any, the agency may take to remove or overcome any barriers to competition before any subsequence acquisition for the supplies or services required." *See Google, Inc. v. United States*, 95 Fed. Cl. 661, 678 (2011) (granting a preliminary injunction where the agency failed to comply with this requirement). In *Spherix,* the entire purpose of invoking the exception was to better posture the forthcoming contract for competition. Here, unlike *Spherix*, the VA is attempting to pre-determine "the winner" of the consolidated system without any consideration of the benefits of competition, and without any intention to obtain competition in the future.

Third, the Court in *Spherix* found it significant that Spherix's "protest came only after [ReserveAmerica] had nearly completed the first phase of modification." *Id.* at 517. Thus, in *Spherix*, there had already been substantial performance of the protested modification, which

would have resulted in wasted effort had the agency been forced to change course.  If anything, the 2014 GAO Report indicates that the DoD and VA have wasted effort by failing to develop engage in appropriate planning.   Here, however, the VA Secretary has not even issued the required 30-day notice to Congress prior to award.   (*See* 41 U.S.C. 3304(a)(7), and AR generally).  CliniComp, on the other hand, acted reasonably and with no delay, seeking review of the VA decision on June 14, 2017, (AR Tab 44), within two weeks of the signing of D&F (AR Tab 1), and mere days after it was announced via the June 5th News Release (AR Tab 44 at 2166-67).  CliniComp merely asks the VA to engage in full and open competition as required by law.  With respect to its conduct concerning this bid protest, unlike Spherix, CliniComp has acted in a manner that has undoubtedly saved the agency from expending time and resources unnecessarily.

II.    **FAR § 6.302-7(b) Denies Secretary Shulkin Authority to Invoke the Public Interest Exception on Grounds Covered by the Specific CICA Exceptions.**

The public interest exception is intended to apply to rare and special situations not specifically considered by Congress when it enacted the exceptions to CICA.   Regarding application of the exception, FAR § 6.302-7(b) states:  "This authority may be used <u>when none of the other authorities in 6.302 apply</u>."  (Emphasis added).  Conversely stated, since this Court has recognized that 6.302-7 serves as a limitation on the Secretary's discretion, *Spherix II*, 58 Fed. Cl. at 357, the public interest may <u>not</u> be invoked if other exceptions apply.

This Court has held that the definition of "apply" includes "[t]o put to use with a particular subject matter apply the law to the facts."  *Graves v. Secretary of the Dept. of Health and Human Services*, 109 Fed. Cl. 579, n.11 (2013), citing *Black's Law Dictionary* 116 (9th ed. 2009).  Here, Congress has provided two specific exceptions that directly "apply" to the subjects

22

asserted in the D&F.  CICA Exception #1 (41 U.S.C. § 3304(a)(1)) applies to the subject of "only one responsible source," and CICA Exception # 2 (41 U.S.C. § 3304(a)(2)) applies to the subject of "unusual and compelling urgency."  Because Congress has provided specific exceptions for those subjects, FAR § 6.302-7(b) denies Secretary Shulkin authority to invoke the public interest exception on those grounds.

FAR § 6.302-7(b) properly reflects that Congress never intended an agency secretary to invoke the public interest exception to override other CICA exceptions.[5]  The reason is analogous to the explanation given in *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 660 (2003), where the Court found that the "best interest" exception in 31 U.S.C.A. § 3553 did not override accompanying provision regarding "urgent and compelling circumstances":

> [A] holding that the "best interest" finding is not reviewable would be tantamount to giving agencies a license to override the automatic stay at will.  Such a conclusion would not only render the "urgent and compelling" prong of the statute largely superfluous, but would make no sense in the context of a statute that was passed by Congress to strengthen the stay.  The court simply cannot subscribe to the notion that the same Congress that, as repletely indicated in the legislative history of CICA, sought to bolster the GAO stay and prevent agencies from undercutting the protest review process would then arm agencies with an override option that could easily defeat those purposes – invocable essentially at will and with no judicial review.

Just as the Court in *PGBA* could not subscribe to the notion that Congress intended the "best interest" exception to swallow the accompanying "urgent and compelling circumstances" provision, so too this Court should not subscribe to the notion that Congress intended the "public interest" exception to swallow the exceptions regarding "only one responsible source" or

---

[5]  The legislative history of CICA, as set forth in H.R. Conf. Rep. 98-861, S. Rep. 98-50, and S Rep 98-369, reveals that the only as passing mention of the public interest exception, and provides no support for an assertion that this exception was intended to override the other specific exceptions enacted by Congress.  Surely, if Congress had intended the exception to be co-extensive and allow an agency secretary to overrule the other six exceptions, the legislative history would have reflected this counterintuitive interpretation of CICA.

"unusual and compelling urgency."   The very purpose of FAR § 6.302-7(b) is to prevent the public interest exception from being used in this manner.

Review of the D&F demonstrates that, while guised as a "public interest" issue, the true basis for Secretary Shulkin's decision arises from the subjects covered by CICA Exceptions #1 and #2.  Regarding Exception #1 ("only one responsible source"), the D&F uses the term "single common system" at least ten times in describing the VA's requirements.  (AR Tab 1 at 1-4).  The desire for a "single common system" led Secretary Shulkin to determine "that it is in the public interest for VA TAC to issue a solicitation directly to Cerner for the acquisition of the EHR system."  (AR Tab 1 at 5).  Accordingly, the Secretary evidently determined that Cerner was the "only one responsible source" that could provide a "single common system."

If the basis for the D&F is that only Cerner can provide a "single common system" with the DoD, then CICA Exception #1 is the exception that "applies."  Under FAR § 6.302-7(b), the VA is then bound to satisfy the requirements of that exception.  However, as discussed in Section IV below, Exception #1 is unavailable because the VA cannot satisfy the requirements for a brand-name justification.

Similarly, while not directly mentioned in the D&F, the VA News Release announcing the decision suggests that "urgency" may have been in a signifcant factor in the decision to forego competition.   (AR Tab 44 at 2166-67).   However, if urgency is the basis for the Secretary's decision, then VA must satisfy the requirements of Exception #2, which applies to the issue of "unusual and compelling urgency."  Because CICA provides a specific exception for the subject of urgency, FAR § 6.302-7(b) denies Secretary Shulkin authority to invoke the public interest exception on urgency grounds.

In summary, under § 6.302-7(b), the Secretary may not invoke the public interest exception to circumvent the requirements of the specific exceptions enacted by Congress. FAR § 6.302-7(b) only authorizes the use of the public interest exception when "none of the authorities in 6.302 apply." Congress provided specific exceptions for "only one responsible source" and "unusual compelling urgency." Therefore, under FAR § 6.302(b), Secretary Shulkin is denied authority to use the public interest exception.

## III.  The VA's Lack of Advance Planning Precludes Reliance on the Public Interest Exception.

CICA states: "In no case may an executive agency … enter into a contract for property or services using procedures other than competitive procedures on the basis of the lack of advance planning…." 41 U.S.C. § 3304(e)(5)(A)(i). *See also* FAR § 6.301(c). This prohibition applies to all seven of the CICA Exceptions in 41 U.S.C. § 3304(a) including #7 – Public Interest.

The issue of interoperability between the VA and DoD is a longstanding one, which has existed for many years. (AR Tab 1 at 1, ¶ 3.) In his press conference, Secretary Shulkin states: "Congress has been urging the VA and DoD for at least 17 years — from all the way back in 2000 — to work more closely on EHR issues." (AR Tab 44 at 2169.) The 2014 GAO Report found that the VA and DoD had engaged in a lack of coordinated planning, which had resulted in significant waste of time and effort, and the GAO made specific recommendations for the agencies to follow in coordinating their future EHR efforts. (AR Tab 5 at 52-53.) There is no evidence that the agencies followed the GAO's planning recommendations.

The VA and DOD have been aware of the requirement for interoperability for at least 17 years. Now, as shown in his press release, Secretary Shulkin states: "Because of the urgency

and the critical nature of this decision, I have decided that there is a public interest exception to the requirement for full and open competition in this technology acquisition." (AR Tab 44 at 2167) (emphasis added). Notice in his statement that Secretary Shulkin attributes his decision to involve the public interest exception to "urgency." The urgency, however, is caused by a lack of advance planning.

The bottom line is that the AR is replete with evidence of a lack of advance planning. In *Innovation Development Enterprises of America, Inc. v. United States*, 108 Fed. Cl. 711 (2013), the Court sustained a protest because "CICA provides that sole-source procurements may not be used when the circumstances justifying the award were due to the agency's own lack of advance planning." *Id.* at 727. Here, the circumstances overwhelmingly reveal that the sole source award was due to the VA's lack of advance planning. Under 41 U.S.C. § 3304(e)(5)(A)(i), Secretary Shulkin has no authority to authorize the award of a sole source contract to Cerner.

## IV. The D&F Is Actually a Brand-Name Justification Which Cannot Be Used to Deprive a Responsible Offeror an Opportunity to Have Its Product Evaluated Through the Competitive Lens.

"This court is not bound by labels selected by the parties," *Hubbs v. United States*, 20 Cl. Ct. 423, 428 (1990), and is not bound to accept as true mere "labels and conclusions." *Bowles v. United States*, No. 14-1241C, 2015 WL 4710258, at *2 (Fed. Cl. July 31, 2015) citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The court must conduct a careful examination of a party's assertions to determine their true character." *Wheeler v. United States*, 3 Cl. Ct. 686, 688 (1983) citing *Mason v. United States*, 222 Ct.Cl. 436, 442 (1980).

In this case, this Court should review the D&F for what it actually is: a brand-name justification. The VA suggests that it is justified in doing a direct award because of the public

interest.  But, unquestionably what is occurring is a purchase of a brand-name system.  One should call a spade a spade.

As evinced by using the term ten times, the D&F defines the VA's requirement as a "single common system" with the DoD's EHR system.  (AR Tab 1 at 1-4).  In a Memorandum for Record ("MFR") dated May 31, 2017, under the subject of "Definition and Usage of Single Common System," a U.S. Navy Captain explains, "The word 'single' addresses the fact that VA will be leveraging the EHR solution (with <u>Cerner Millennium as the core</u>) acquired and being implemented by the Department of Defense (DoD)."  (AR Tab 21 at 436) (emphasis added).[6]

By virtue of having "Cerner Millennium as the core," the "single common system" is a brand-name specification.[7]   Brand-name specifications are addressed in FAR § 11.105.  Paraphrased, FAR § 11.105 limits the use of a brand-name specifications to situations where market research establishes that other sources cannot provide the goods or services.

In this case, the AR establishes that competition is available from multiple other sources capable of providing EHRs that are interoperable with DoD's EHR.  (AR Tab 38 at 1248-1748).  In the D&F, the Secretary uses the word "interoperability" numerous times but does not provide a definition.  If interoperability is a matter of a data-sharing using data mapping to the same data structure, then the existing DoD and VA EHRs are already highly interoperable based on a report

---

[6] There is no indication in the AR that Secretary Shulkin was a recipient of the MFR and the D&F does not mention the MFR.  (AR Tab 1, Tab 21).  In fact, the MFR sounds like it was drafted after the D&F was prepared, although the date of the MFR is May 31, 2017, and the D&F was signed on June 1, 2017.  (Compare Tab 21 at AR 436 ("The 'single common system' terminology' properly bounds the Department of Veterans Affairs (VA) Determination and Finding (D&F) intent") to AR Tab 1 at 5).

[7]  A brand-name specification is distinguishable from a brand-name or equal specification.  The latter "permit prospective contractors to offer products other than those specifically referenced by the brand-name" and, hence, "provide for full and open competition."  FAR 6.302-1(c)(2).

*Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order*

to Congress that the Joint Legacy Viewer ("JLV") has achieved "more than 99 percent of the most frequently used and high value data terms."  (AR Tab 3 at 8).

In a broader context, there is more to "interoperability" because the practice of medicine is an evolving profession.  New data structures must be constantly added.  With the constant adding of new data structures, interoperability will remain a never-ending challenge.  As explained in the D&F, the VA's current use of the Joint Legacy Viewer "is fundamentally constrained by ever-changing information sharing standards, separate chains of command, complex governance, separate implementation schedules that must be coordinated to accommodate those changes from separate program offices that have separate funding appropriations …." (AR Tab 1 at 1-2).

Given the presence in the JLV of "more than 99 percent of the most frequently used and high value data terms," (AR Tab 3 at 8), any competent EHR vendor should be able to add the new data structures to achieve interoperability.  As a result, Cerner is not the only EHR vendor that is technically capable of providing the interoperability that the VA is seeking.  This observation is captured in numerous places in both the D&F and the accompanying AR.

For example, paragraph 5 of the D&F discusses the 2014 competition conducted by DoD "for the acquisition of a commercial-off-the-shelf EHR system using full and open competitions."  (AR Tab 1 at 2).  The acquisition process "took approximately 26 months" because of the keen competition between EHR offerors.  (*Id.*)  Here, there is no reason to believe the same competitors are not equally capable of providing the next generation EHR for the VA.

In paragraph 10 of the D&F, the Secretary acknowledges that there are "many large commercial EHR vendors" and that Cerner only holds a competitive advantage of being "best positioned" through its incumbency.  (AR Tab 1 at 3-4) (emphasis added).    However,

28

CliniComp is also an incumbent provider of EHRs to the DoD.   (*See* AR Tab 5 at 22, 27 referencing use of CliniComp's Essentris product within the DoD).  The AR includes a detailed explanation by CliniComp's CEO of why CliniComp is just as qualified—if not better qualified—to be awarded the contract for the VA's next generation EHR.  (AR Tab 44 at 2189-90).

The Grant Thornton Report likewise establishes that multiple vendors are capable of providing interoperability with Cerner's DoD EHR—a commercial item.  The Grant Thornton report explains that Vista "served as an industry catalyst in the development of commercial EHR vendors such as Cerner and Epic" and that "more agile and technologically advanced EHR platforms are [now] readily available in the commercial sector …."  (AR Tab 7 at 236).  After interviews and demonstrations by multiple commercial EHR vendors, Grant Thornton found that all of the available options, including both commercial products and the commercialized VistA option had the technical ability to provide complete interoperability with DoD and community providers.  (AR Tab 7 at 244, Figure 2).  Furthermore, Grant Thornton found that the commercial option provided "low" risk due to the "known availability of vendors in the market."  (AR Tab 7 at 249, Figure 6).

Concerning the availability of competition, the VA issued a Sources Sought notice for EHR systems and directed responses to include "how the vendor would interface a commercialized version of eHMP or a commercial alternative with VistA and/or commercial EHRs."  (AR Tab 35 at 1197).  The fact that 25 vendors responded to that inquiry is strong evidence that other companies have similar products that can provide interoperability or can be modified to meet the VA's interoperability requirements. (AR Tab 38 at 1248-1748).

In fact, Cerner's own response to the VA's Sources Sought confirms that Cerner's EHR is specifically "designed using the latest industry interoperability standard and [is] designed to function independently of a specific EHR." (AR Tab 38 at 1382) (emphasis added). If Cerner's EHR at the DoD is as interchangeable with other EHRs as Cerner claims, then the existing VA EHRs (such as CliniComp) are likewise interoperable with the DoD.

In summary, the AR overwhelmingly establishes that other vendors, including CliniComp, have EHRs that can provide the interoperability or can be modified to meet the VA's interoperability needs. Almost more compelling is the fact that there is nothing in the AR establishing that Cerner is uniquely qualified to provide the requisite interoperability. Such evidence is absolutely lacking in the D&F, as is any discussion of how Cerner's system is different than other systems and therefore provides greater interoperability. There is no explanation in the D&F, much less a clear and convincing justification, of why this brand-name product is necessary.

Because the D&F is actually a brand-name justification, CliniComp's protest is analogous to *Google, Inc. v. United States*, 95 Fed. Cl. 661 (2011). In that case, the Department of Interior ("Interior") was under pressure because it did not fully comply with the Federal Information Security Management Act ("FISMA"). *Id*. at 663. Therefore, Interior's Chief Information Officer ("CIO") issued an "Email Solution Selection Notice of Record" to announce that "Microsoft Exchange was chosen as the single consolidated email solution for consistency and interoperability with [Interior] enterprise license purchases and was the result of exhaustive analyses from the EMS [Enterprise Messaging Service] team." *Id*. (emphasis added). Based on the request of the Interior CIO, a "Limited Source Justification" was prepared "to limit

competition for messaging and collaboration solutions to resellers of the Microsoft Business Productivity Online Suite–Federal (BPOS-Federal) ….” *Id.* at 669.

Google sought a preliminary injunction from the Court of Federal Claims, alleging a CICA violation based on Interior's decision to exclusively procure Microsoft's BPOS-Federal Messaging Solution. In granting Google's request for a preliminary injunction, the Court noted deficiencies in the Standardization D&F supporting Interior's decision. Among other things, the Court found that the D&F did not consider “embedded costs, including the cost of organizational lock-in” that would flow from standardizing on Microsoft's product without considering Google. *Id.* at 678. Additionally, the Court found that the D&F contained no “listing of sources” that expressed an interest in the procurement, and “there [was] no statement of the actions that Interior plans “to remove or overcome [a] barrier to competition before any subsequent acquisition for the supplies or services required.” *Id.*

In this case, Secretary Shulkin has decided that the VA will standardize on “Cerner Millennium as the core.” (AR Tab 21 at 436). However, the VA has not prepared a proper justification for its brand-name specification of Cerner Millennium. FAR § 11.105 requires the justification to address whether “other companies have similar products that can provide the interoperability or can be modified to meet the interoperability.” The AR clearly demonstrates that other companies have products that can provide interoperability, but the D&F does not address whether similar products can meet or be modified to meet the VA's interoperability needs.

Additionally, as in *Google*, the D&F signed by Secertary Shulkin does not consider the embedded cost of granting organization lock-in to Cerner, does not list the sources that expressed interest in the procurement, and has no statement of action to remove or overcome barriers to

competition.  As previously mentioned, the VA's action is distinguishable from the *Spherix* case, where the agencies used an interim measure to posture the contract for full and open competition. Instead, what the VA has done is more like *Google* where the agency failed to consider the harm incurred by excluding competition and failed to consider or address ways to overcome the perceived barriers to competition.

*Savantage Financial Services, Inc. v. United States*, 81 Fed. Cl. 300 (2008) is another highly analogous decision.  In that case, the Department of Homeland Security ("DHS") sought to consolidate its financial management software vendors from five to two.  By way of background, DHS was created in 2003 by a merger of 22 separate federal agencies.  DHS had been seeking to consolidate its financial system software by migrating all of the components to a shared software baseline.  One of the incumbent software vendors was Savantage.  As part of the consolidation, DHS issued a brand-name justification selecting only Oracle and SAP's financial management systems for exclusive future use.

Savantage filed a protest of DHS's decision, asserting that there were several other responsibility sources, including itself, from which offers for compliant financial management software systems could have been solicited.  *Id.*  The Court agreed and found that DHS should have competitively evaluated the merits of each source that was competent to perform the contract.  The Court explained that, before an agency may initiate a sole source procurement, the agency must justify and authorize its use of noncompetitive procedures.  *Id.* at 307.  In particular, the Court stated **"**DHS cannot merely select certain software systems because it feels they are most cost-effective.**"**  *Id.* at 308 (emphasis added).  Because there were additional responsible sources, the Court concluded that DHS's decision to use only two particular financial

32

management systems, without competition, constituted a sole source procurement which violated CICA.  *Id.*

Just as the brand-name justification in *Savantage* never asserted that Oracle and GAP were the only two responsible sources that could provide the financial management, so too Secretary Shulkin's D&F does not state that Cerner is the only EHR vendor who can meet the VA's requirements.  (AR Tab 1 at 1-4).  In fact, there were 25 responsible sources who responded to the VA's Sources Sought.  (AR Tab 38 at 1248-1748).  And, the AR demonstrates that CliniComp is among the responsible sources.  (AR Tab 7 at 249; AR Tab 44 at 2189-90; AR Tab 38 at 1248-1748).

To summarize, the VA's D&F is nothing more than a brand-name justification.  In *Savantage*, the Court observed:  "On its face, then, it appears that DHS was attempting to avoid the full and open competition requirements of CICA by means of this Brand Name justification." *Id*. at 308.  Likewise, the VA is "attempting to avoid the full and open competition requirements of CICA by means of this Brand Name justification."  In *Savantage*, the Court held that "DHS must evaluate the merit of each offeror's product through the competitive lens."  *Id*. at 308. Similarly, the VA must evaluate the merits of CliniComp's EHR through the competitive lens.

## V.  The Decision to Award a Sole Source Contract to Cerner Is Arbitrary and Capricious Because It Failed to Consider Other Important Aspects of the Interoperability Requirement.

As shown by the D&F's use the term "interoperability" four times and the term "seamless" eight times, the problem the VA is trying to solve is the lack of interoperability for electronic health records for veterans and those members of the Armed Services who will someday become veterans.  (AR Tab 1 at 1-5).  However, by focusing on interoperability with the DoD, Secretary Shulkin's decision addresses only one-third of the interoperability problem.

In doing so, the decision completely overlooks the following interoperability requirements: (1) interoperability with TRICARE providers, who are treating both active duty military personnel and veterans, and (2) interoperability within the VA itself – the VA's existing EHR system lacks interoperability since there are approximately 130 different versions of VistA across the country.

The D&F failed to address interoperability with TRICARE providers.  Private sector companies provide medical treatment to some active duty and retired veterans as TRICARE providers.  (AR Tab 29 at 712).  The Grant Thornton Report states that VA interoperability with the systems of these private sector providers (*e.g.*, TRICARE) is just as important as interoperability with DoD.  (AR Tab 7 at 242).  Thus, the Grant Thorton Report recommended that interoperability with the DoD alone should not drive the VA's decision.  (*Id.*)

Another important interoperability aspect ignored by the VA is that "most [VA Medical Centers] have customized their local versions of VistA, leading to approximately 130 different versions of VistA across the country."  (AR Tab 30 at 817).  Thus, agency's exclusive focus on interoperability with DoD is an oversimplification of the problem.  The AR demonstrates that "VHA's EHR issues stymie interoperability among VHA facilities as well as between VHA and DoD and other non-VHA providers."  (AR Tab 30 at 819).  Further explanation can be found in a Sources Sought issued by the VA on April 11, 2017, which notes that the VA currently utilizes 130 different and unstandardized instances of the VistA EHR.  (AR Tab 35 at 1210).

According to the United States Court of Appeals for the Federal Circuit, an agency's decision is "arbitrary and capricious when the agency <u>entirely failed to consider an important aspect of the problem</u> …." *Alabama Aircraft Indus., Inc.—Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (emphasis added).  Secretary Shulkin's decision entirely fails to consider two important aspects of solving the interoperability problem (*e.g.*, interoperability

with TRICARE providers and interoperability within the VA). Because the Secretary's decision entirely failed to consider two important aspects of the interoperability problem, his decision is arbitrary and capricious. *Id.*

## VI. The VA's Sole Source Decision is Arbitrary and Capricious Because It Failed to Consider Cost.

There is nothing in the D&F that addresses costs. (AR Tab 1 at 1-4). In the June 5, 2017 press conference, Secretary Shulkin admitted he had no ballpark estimate of how much a Cerner contract might cost. (AR Tab 44 at 2171, 2174). Because the Secretary admitted having no consideration of cost, his source selection decision was arbitrary and capricious.

In failing to consider cost, Secretary Shulkin violated a fundamental procurement precept that source selection decisions must give meaningful consideration to costs. *Serco Inc. v. United States*, 81 Fed. Cl. 463, 491 (2008)("the FAR ordains that '[p]rice or cost to the Government shall be evaluated in every source selection.'"), citing FAR § 15.304(c)(1). "[A]n evaluation that fails to give price its due consideration is inconsistent with CICA and cannot serve as a reasonable basis for an award." *See also Boeing, Sikorsky Aircraft Support*, 97–2 C.P.D. ¶ 91, 1997 WL 611539, at * 10 (1997); *I.M. Systems Group*, B-404583 (Feb. 25, 2011); *Electronic Design, Inc.*, B-279662 (Aug. 31, 1998); and *RTF/TCI/EAI Joint Venture*, B-280422 (Dec. 29, 1998).

In *Serco*, 81 Fed. Cl. 463, this Court set aside an award decision in a negotiated procurement because of an agency's inadequate treatment of price. The Court also recognized that the "GAO has repeatedly held that price must be a "significant evaluation factor." *Id.* at 491. In the case of the D&F signed by Secretary Shulkin, it is not that there was an inadequate treatment of cost -- there was no consideration of cost at all. The Secretary admitted during the

press conference he had no idea what the cost might be, and the AR demonstrates that he had no idea if another vendor could provide an EHR that is interoperable with the DoD's EHR for a fraction of the cost.

In *Glotech, Inc*., B-406761 (Aug. 21, 2012), the agency did not consider price in issuing blanket purchase agreements under a Federal Supply Schedule program involving a maximum of $900 million in orders.  The GAO sustained the protest because the agency selected vendors only on the basis of their technical evaluation scores.  A blanket purchase agreement "is not an enforceable contract."  *Crewzers Fire Crew Transport v. United States*, 111 Fed. Cl. 148, 157 (2013).  Nevertheless, the GAO recognized that price or cost should always be considered in any procurement.  Therefore, the GAO sustained the protest.

Regarding the government's procurement of IT investments, such as EHR, OMB Circular A-130 states that decision to improve, enhance, modernize, or develop new IT investment "after conducting an alternatives analysis that includes both government-provided (internal, interagency, and intra-agency where applicable) and commercially available options, and the option representing the best value to the Government has been selected."  (Emphasis added).

"[T]he Competition in Contracting Act ... unambiguously requires:  'In prescribing the evaluation factors to be included in each solicitation for competitive proposals, [the agency] ... shall include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals.'"  *Serco Inc.*, 81 Fed. Cl. at 491.  FAR § 15.304(c)(1) gives "effect to the statute and its legislative history."  *Id.*  Clearly, Congress believes that price or cost is an essential element in all acquisitions.  This observation is also captured in FAR § 1.102-2(c)(1), which holds procurement officials "responsible and accountable for the wise use

of public resources as well as acting in a manner which maintains the public's trust."  By not considering cost, Secretary Shulkin violated his FAR § 1.102-2(c)(1) duty.

Regarding the government's requirement to consider costs, the present facts are analogous to a competitive range determination where the government decides it will no longer consider certain vendors because the government does not perceive those vendors as being in contention for contract award.  Although a competitive range determination involves evaluation of proposal, here the VA excluded CliniComp and all other potential offerors without even the benefit of obtaining their proposals.

It is well-established that a technically acceptable proposal cannot be excluded from the competitive range "without taking not account the relative cost of that proposal to the government."  *Bean Stuyvesant, LLC.  v. United States*, 48 Fed. Cl. 303, 338 (2000).  Although CliniComp was not afforded the opportunity to submit a technical proposal, the AR shows that CliniComp is capable of providing the interoperability requirements.  (AR Tab 44 at 2189-90). There is nothing in the AR to the contrary.

Since the purpose of the rule that a technically acceptable proposal cannot be excluded from the competitive range without considering relative costs is to protect taxpayers' money, this same purpose is served by requiring the VA to consider costs before rejecting vendors who are capable of providing the requisite interoperability.  Secretary Shulkin's sole source decision on a multi-billion dollar contract without considering cost violates FAR § 1.102-2(c)(1).

**VII.  The VA's Sole Source Decision Is Arbitrary and Capricious Because It Violates FAR § 34.005-1 Which Requires Full and Open Competition Between Alternative Major Systems Sources Until It Is No Longer Economical or Practical to Do So.**

A civilian agency's procurement of a system that exceeds $2 million is a "major system." FAR § 2.101.  The VA's Acquisition Plan reveals the government's post-D&F estimate is now in

excess of ███ billion.  (AR Tab 43 at 2135).   Therefore, the VA's next generation EHR is a major system subject to FAR Part 34, Major System Acquisition.

FAR § 34.005-1(a) provides that the program manager "shall throughout the acquisition process, promote full and open competition and sustain effective competition between alternative major system concepts and sources, as long as it is economically beneficial and practicable to do so."   In this case, the AR contains plentiful evidence of alternative major system sources, including CliniComp.  (AR Tab 7 at 249; Tab 44 at 2189-90; Tab 38 at 1248-1748).   In the agency-level protest, CliniComp's CEO literally begged for an opportunity to prove that CliniComp's currently available, web-based EHR system has the technical capability to achieve interoperability between the DoD and VA.  (AR Tab 44 at 2189).   In a follow-on letter, CliniComp again pleaded for an opportunity to prove that it has a superior commercial-off-the-self solution.  (AR Tab 45 at 2193).

FAR § 33.103(h) states:  "Agency protest decisions shall be well-reasoned, and explain the agency's position."   In responding CliniComp's agency-level protest, the VA totally ignored CliniComp's plea for a "fly-off" to allow CliniComp to demonstrate that its EHR is more interoperable than Cerner's EHR.  (AR Tab 46 at 2198-99).  Furthermore, the VA totally ignored CliniComp's urging of parallel prototype contracts to reduce risk to the VA.  (AR Tab 46 at 2198-99).

Under the present facts, it is economically beneficial and practicable for the VA to sustain effective competition between alternative major system sources—Cerner's EHR and CliniComp's EHR.  One of the primary benefits would be risk reduction for the program.   In this regard, the VA has acknowledged that the project is high risk:  "No guarantees.  High-risk process, particularly when you're doing this in the largest integrated health system in the

38

country.  And so this is high risk."  (AR Tab 44 at 2173).  Similarly, the VA Acquisition Plan shows "technical risk is considered high" and "schedule risk is considered high."  (AR Tab 43 at 2139-40).

As previously mentioned, notwithstanding CliniComp's letter dated June 29, 2017 encouraged "awarding parallel prototype contracts for competitive demonstrations of interoperable capabilities," the VA declined to address the topic.  (AR Tab 45 at 2192; AR Tab 46 at 2198-99).  Moreover, there is nothing in the AR addressing the VA's refusal to follow FAR § 34.005-1(a).

The Court should find the VA's action arbitrary because there is a "violation of statute or regulation in connection with a procurement or a proposed procurement."  *ViON Corporation v. United States*, 122 Fed. Cl. 559, 567 (2015).  The VA's sole source decision is arbitrary because it violates FAR § 34.005-1, which requires agencies who are procuring a major system to pursue full and open competition between alternative major systems sources until it is no longer economical or practical to do so.  This egregious violation results in $▮▮▮ billion in taxpayers' money being needlessly subjected to high risks.  Therefore, the Court should issue an injunction precluding the agency from awarding to Cerner as planned.

## VIII. The VA Has Failed to Comply With the Statutory Requirements of the Public Interest Exception, Including Written Notification to Congress.

To invoke the public interest exception, 41 U.S.C. § 3304(a)(7) requires the Secretary to provide written notice to Congress no less than 30 days before award.  Nothing in the AR shows that such notice has been provided, despite the fact that the government's indication to this Court that it intends to award on or shortly after October 2nd (less than 30 days from now).

## IX. This Court Should Grant Injunctive Relief in Favor of CliniComp.

CliniComp will suffer irreparable harm if injunctive relief is not granted.  CliniComp is a leading supplier of EHRs to the VA.  Without injunctive relief, CliniComp will be deprived of the opportunity to compete for and potentially be awarded a lucrative government contract. *Savantage*, 123 Fed. Cl. at 28 (2015).   Moreover, CliniComp's competitor, Cerner, will achieve "organizational lock-in" for VA EHRs.  *Google*, 95 Fed. Cl. at 678.  Without relief from the Court, CliniComp will be prejudiced by the loss of significant revenues, lost profit, lost work, the possible loss of employees, and the loss of opportunity to remain involved for this and other future procurements for EHR systems.

Finally, it is in the public interest to grant CliniComp's request for injunctive relief. CICA recognizes that the inherent benefits of competition serve the public interest.  In this case, the public interest is best served by having the VA follow applicable statutes and regulations regarding full and open competition.

## CONCLUSION

The Court should grant judgment on the administrative record in favor of CliniComp and enter a permanent injunction enjoining the U.S. Department of Veterans Affairs ("VA"), its agents, employees, officers and representatives, and those acting in concert with or participating with any of the foregoing, from awarding a sole source contract to Cerner Corporation for the development of the VA's next generation EHR systems.

Dated:  September 11, 2017

                                                 Respectfully submitted,


                                                 <u>/s/ Richard J.R. Raleigh, Jr.</u>
                                                 Richard J.R. Raleigh, Jr. (Attorney of Record)
                                                 Jerome S. Gabig
                                                 Christopher L. Lockwood

                                                 Attorneys for CliniComp International, Inc.
                                                 WILMER & LEE, P.A.
                                                 100 Washington Street, Suite 200
                                                 Huntsville, Alabama 35801
                                                 Telephone:    (256) 533-0202
                                                 Facsimile:    (256) 533-0302
                                                 rraleigh@wilmerlee.com
                                                 jgabig@wilmerlee.com
                                                 clockwood@wilmerlee.com

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 11th day of September, 2017, a copy of the foregoing was filed with the Court's ECF system and served via email or by First Class U.S. Mail, postage prepaid to:

William P. Rayel, Esq.
Senior Trial Counsel
National Courts Section
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW, Room 10128
Washington, DC 20530
William.Rayel@usdoj.gov

David R. Hazelton, Esq.
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004-1304
David.Hazelton@lw.com


<u>/s/ Richard J.R. Raleigh, Jr.</u>
Richard J.R. Raleigh, Jr.